IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SILVESTER HAYES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-cv-2271-S |
| | § | |
| CITY OF DALLAS, et al., | § | |
| | § | |
| Defendants. | § | |

---

**DEFENDANTS' BRIEF IN SUPPORT OF
THEIR RENEWED MOTION FOR SUMMARY JUDGMENT**

---

CITY ATTORNEY OF THE CITY OF DALLAS

Tammy L. Palomino
City Attorney

*s/ Lindsay Wilson Gowin*
Lindsay Wilson Gowin
Deputy Chief of Torts
Texas State Bar No. 24111401
lindsay.gowin@dallas.gov

Dallas City Hall 7DN
1500 Marilla Street
Dallas, Texas 75201
Telephone:     214-670-3519
Telecopier:    214-670-0622

*Attorneys for Defendants Holly Harris, Walter
Guab, and the City of Dallas*

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ 3

I.      Introduction ......................................................................................................................... 5

II.     Statement of Undisputed Facts ......................................................................................... 6

III.    Legal Standards Applicable to Motions for Summary Judgment ...................................... 13

   A.   Summary Judgment ......................................................................................................... 13

   B.   The qualified immunity defense alters the burden of proof on summary judgment. ...... 14

IV.   Arguments and Authorities ................................................................................................ 16

   A.   The officers are entitled to qualified immunity on all claims against them. ................... 16

      1. Videos from the officers' body-worn cameras show that Harris and Guab did not
violate Plaintiff's constitutional rights. .............................................................................. 17

         a.  Videos from the officers' body-worn cameras show that Harris and Guab did not use
excessive force against Plaintiff. ......................................................................................... 18

         b.  Video shows ample probable cause for Plaintiff's arrest. ........................................ 23

      2. Plaintiff cannot show that Harris and Guab violated a constitutional right that was
clearly established at the time of the incident. .................................................................... 25

   A.   The City is entitled to summary judgment because the videos show that there were no
underlying constitutional violations. .................................................................................... 28

V.      Conclusion ........................................................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Alpha v. Hooper*,
 440 F. 3d 670 (5th Cir. 2006)...................................................................................28

*Anderson v. Creighton*,
 483 U.S. 635 (1987)..................................................................................15, 16

*Ashcroft v. al-Kidd*,
 563 U.S. 731 (2011)..........................................................................................15

*Atwater v. City of Lago Vista*,
 532 U.S. 318 (2001)..........................................................................................23

*Babb v. Dorman*,
 33 F.3d 472 (5th Cir. 1994) ...........................................................................16

*Betts v. Brennan*,
 22 F.4th 577 (5th Cir. 2022) .............................................................18, 21, 25

*Brown v. Callahan*,
 623 F.3d 249 (5th Cir. 2010)..........................................................................15

*Burge v. St. Tammany Parish*,
 187 F.3d 452 (5th Cir. 1999)..........................................................................22

Cadena v. Ray,
 728 F. App'x 293 (5th Cir. 2018) .............................................................27, 28

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)..................................................................................13, 14

*City of Los Angeles v. Heller*,
 475 U.S. 796 (1986)..........................................................................................28

*Davis v. McKinney*,
 518 F.3d 304 (5th Cir. 2008)..........................................................................16

*District of Columbia v. Wesby*,
 583 U.S. 48 (2018)............................................................................................25

*Duckett v. City of Cedar Park*,
 950 F.2d 272 (5th Cir. 1992)..................................................................13, 23

*Eason v. Thaler*,
 73 F3d 1322 (5th Cir. 1996) ...........................................................................14

*Est. of Davis ex rel. McCully v. City of N. Richland Hills*,
 406 F.3d 375 (5th Cir. 2005)..........................................................................28

*Forsyth v. Barr*,
 19 F.3d 1527 (5th Cir. 1994)..........................................................................14

*Foster v. City of Lake Jackson*,
 28 F.3d 425 (5th Cir. 1994). ..........................................................................15

*Gassner v. City of Garland*,
 864 F.2d 394 (5th Cir. 1989)..........................................................................14

*Gibson v. Rich*,
 44 F.3d 274 (5th Cir. 1995) ...........................................................................16

*Graham v. Connor*,
 490 U.S. 386 (1989)..........................................................................................18

*Griggs v. Brewer*,
 841 F.3d 308 (5th Cir. 2016)..........................................................................15

*Harlow v. Fitzgerald*,
 457 U.S. 800 (1982)..................................................................................14, 15

*Joseph ex rel. Estate of Joseph v. Bartlett*,
  981 F.3d 319 (5th Cir. 2020)............................................................................18, 25
*Lynch Props. v. Potomac Ins. Co.*,
  140 F.3d 622 (5th Cir. 1998)...................................................................................14
*Malley v. Briggs*,
  475 U.S. 335 (1986)..................................................................................................16
*Maryland v. Wilson*,
  519 U.S. 408 (1997)............................................................................................18, 24
*Matsushita Elec. Indus. Co. v. Zenith Radio*,
  475 U.S. 574 (1986)..................................................................................................14
*McClendon v. City of Columbia*,
  305 F.3d 314 (5th Cir. 2002)...................................................................................15
*Michigan v. Long*,
  463 U.S. 1032 (1983)................................................................................................24
*Pearson v. Callahan*,
  555 U.S. 223 (2009)..................................................................................................15
*Pennsylvania v. Mimms*,
  434 U.S. 106 (1977).................................................................................18, 19, 20, 24
*Pierce v. Smith*,
  117 F.3d 866 (5th Cir. 1997)...................................................................................15
*Pineda v. City of Hous.*,
  291 F.3d 325 (5th Cir. 2002)...................................................................................28
*Poole v. City of Shreveport*,
  691 F.3d 624 (5th Cir. 2012)..............................................................................17, 28
*Rakas v. Illinois*,
  439 U.S. 128 (1978)..................................................................................................24
*Scott v. Harris*,
  550 U.S. 372 (2007)..................................................................................................17
Solis v. Serrett,
  31 F.4th 975 (5th Cir. 2022)...................................................................................27
*Topalian v. Ehrman*,
  954 F.2d 1125 (5th Cir. 1992).................................................................................13
*Tucker v. City of Shreveport*,
  998 F.3d 165 (5th Cir. 2021).............................................................................26, 27

## Statutes

42 U.S.C. § 1983............................................................................................................24
Tex. Pen. Code § 38.01................................................................................................20
Tex. Pen. Code § 38.03................................................................................................20
Tex. Pen. Code §§ 38.03..............................................................................................20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SILVESTER HAYES,                          §
                                          §
        Plaintiff,                        §
                                          §
v.                                        §        CIVIL ACTION NO. 3:23-cv-2271-S
                                          §
CITY OF DALLAS, et al.,                   §
                                          §
        Defendants.                       §

---

**DEFENDANTS' BRIEF IN SUPPORT OF
THEIR RENEWED MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE COURT:

Defendants Holly Harris[1], Walter Guab, and the City of Dallas move for summary

judgment on all claims pursuant to Federal Rule of Civil Procedure 56. In support of their motion,

Defendants state as follows:

I.    **Introduction**

On October 16, 2021, Dallas Police Department ("DPD") officers Holly Harris and Walter

Guab initiated a lawful traffic stop of a vehicle driven by Plaintiff Silvester Hayes. Videos of the

event show that instead of cooperating and then continuing on his way, Plaintiff instead chose to

angrily insist on "rights" that do not exist, refused to follow Guab's lawful directions to step out

of the car, and strenuously fought against the officers' subsequent efforts to remove him from his

vehicle, handcuff and search him, and place him in the back seat of a police car. And Plaintiff

---

[1] After correctly identifying Defendant Holly Harris in the original complaint (Dkt. No. 1), Plaintiff incorrectly and inexplicably refers to her surname as both "Hobbs" and "Hubbs" in his First Amended Complaint (Dkt. 27). Defendants will refer to her by the correct surname: Harris.

made these choices while armed with a semiautomatic pistol in his hip pocket. Fortunately, the videos show that neither the officers nor Plaintiff were seriously injured.

Two years later, Plaintiff filed the instant action against the City of Dallas, Harris, Guab, and Does 3-10[2]  (Dkt. No. 1). After reviewing Defendants' motions to dismiss and for summary judgment, Plaintiff elected to file a First Amended Complaint (Dkt. No. 27, hereinafter, "Compl.") that asserts the same claims as the original complaint. In Counts 1 and 2 respectively, Plaintiff asserts excessive force and unlawful arrest claims against Harris and Guab. Compl. at 22-31. In Count Three, Plaintiff asserts *Monell* claims against the City, alleging that the City has an unconstitutional policy regarding the use of force and fails to train, supervise, or discipline its police officers. Compl. at 32-39.

The officers' body-worn and dashboard cameras[3] captured the entire encounter with Plaintiff; the videos clearly contradict Plaintiff's version of events and show that the officers acted lawfully. Harris and Guab assert their entitlement to qualified immunity and seek summary judgment on all claims because the video evidence is dispositive of Plaintiff's claims and the issue of qualified immunity should be decided at the earliest possible stage in the litigation.

## II.    Statement of Undisputed Facts

There are no material disputed facts in this case because the entire incident was captured on the officers' body-worn and in-car cameras. App. Ex. 1-22.[4] At approximately 10:46 a.m. on

---

[2] The Court should also dismiss *sua sponte* the John Doe defendants. "The limitations period for a § 1983 action is determined by the state's personal injury limitations period, which in Texas is two years." *Whitt v. Stephens County*, 529 F.3d 278, 283 (5th Cir. 2008). The incident in this case allegedly occurred on October 16, 2021, and thus any future attempts to add or substitute defendants would be untimely. *Id.* at 282-283.

[3] "Body-worn camera" is hereinafter abbreviated as "BWC." Video footage from the dashboard camera shall be referred to as "dashcam."

[4] To avoid unnecessary duplication in the record caused by re-filing the same set of exhibits, "App." refers to the appendix filed in support of Defendants' original motion for summary judgment (Dkt. No. 17) and its accompanying manually filed video exhibits (Dkt. No. 18).

October 16, 2021, DPD officers Harris and Guab were wearing their full police uniforms and patrolling together in a marked DPD police car. App. Ex. 1 (Harris BWC) at 0:00-0:33; Ex. 4 (Guab BWC) at 1:40-1:45. Harris ran a registration check on a 2017 Hyundai sedan and learned that the owner of the car was an individual named "Sylvester Hayes." App. at 7. She then cross-checked the name "Sylvester Hayes" in the Adult Information System ("AIS") law enforcement database, which revealed an active felony arrest warrant for family violence. *Id*. The officers observed the driver of the Hyundai fail to activate its turn signal when turning left from Southern Oaks Boulevard onto Overton Road in Dallas. *Id.*; Ex. 21 (Dashcam) at 0:00-0:02. Guab initiated a traffic stop by driving the police car behind the Hyundai and activating its emergency lights. App. Ex. 21 (Dashcam) at 0:00-0:20. The Hyundai pulled over to the right side of the road and stopped, and Guab parked the police car behind it. *Id.*; App. at Ex. 4 (Guab BWC) at 6:46.

Guab got out of the police car and walked to Plaintiff's window and began politely speaking with him. App. Ex. 21 (Dashcam) at 0:20; Ex. 1 (Harris BWC) at 0:20-1:04. Harris joined Guab a few seconds later. *Id.* at 0:46; Ex. 1 (Harris BWC) at 0:12-. Plaintiff complained but finally provided his driver's license to Guab. App. Ex. 21 (Dashcam) at 1:04-1:16; Ex. 1 (Harris BWC) at 0:20-0:40.

Guab handed the license to Harris, then returned to Plaintiff's window and ordered him to step out of the car for the first time at 10:47:37 a.m. App. Ex. 1 (Harris BWC) at 0:36-45. App. Ex. 1 (Harris BWC) at 0:45. Plaintiff asked, "Why?" and Guab responded, "I'll explain it to you." *Id*. at. 0:35-0:51. Guab tried unsuccessfully to open Plaintiff's door via the outside handle, then reached into the already-open window, unlocked and opened the door, and said, "Step out. I'll explain everything to you." App. Ex. 1 (Harris BWC) at 0:46-1:04; Ex. 21 (Dashcam) at 1:26. Plaintiff responded, "No, sir. Tell me why! Sir, I didn't give you permission to do that" and again

7

demanded an explanation. App. Ex. 1 (Harris BWC) at 0:52-1:26. Guab ordered Plaintiff to step out of the car eleven more times. *Id.* at 0:46-1:27. Plaintiff did not comply, and instead remained seated in the car and argued with increasing agitation, repeatedly complaining that he had not given Guab permission to open the door and demanding that Guab explain why he had to exit the vehicle (*id.*), at one point responding, "No! Let me call my people." *Id.* at 1:10.

Backup officers soon arrived in quick succession. App. at Ex. 1 (Harris BWC) at 1:16; Ex. 21 (Dashcam) at 1:44-2:05. Guab grasped Plaintiff's arm and tried to escort him from the car. App. Ex. 1 (Harris BWC) at 1:26. Another officer opened the front passenger door and looked inside the passenger compartment, where he saw the pistol in Plaintiff's pocket. App. at 7; Ex. 2 (Whitman BWC) at 0:53-1:14; Ex. 21 (Dashcam) at 2:00-2:34. That officer used one hand to grab Plaintiff's right wrist to prevent him from reaching for the gun, and he used the other to remove the gun from Plaintiff's pocket. *Id.*

The video evidence shows that Guab, Harris, and other Dallas police officers worked together to pull Plaintiff out of the car, where he either threw himself or fell to the ground. App. at Ex. 21 (Dashcam) at 2:15-2:25. Plaintiff yelled "You've got your foot on my neck! You've got your foot on my neck!" An officer responded, "No, we don't. I'm watching you." Ex. 2 (Whitman BWC) at 1:25-1:40. The screenshots from Exhibit 2 at 1:29-1:30 shows Plaintiff's repeated accusation is untrue. The first two frames show that both of the officer's feet were on the ground, not on Plaintiff's neck.





The second two frames also show that there were no feet on Plaintiff's neck: the officer's left foot remained on the ground supporting the officer's weight while his right foot was suspended in the air to the right of Plaintiff's head as he placed his right shin between Plaintiff's shoulder blades.





Plaintiff thrashed and pulled away from them, and the officers used a combination of restraint

holds, pressure and body weight to eventually wrestle Plaintiff onto his stomach and handcuff his

wrists behind his back. App. Ex. 1 (Harris BWC) at 1:47-3:23; Ex. 2 (Whitman BWC) at 1:26-

2:36; Ex. 4 (Guab BWC) at 0:00-1:45. Plaintiff continued to fight, thrash, and yell as the officers

lifted him to his feet and maneuvered him to the nearest police car. App. Ex. 1 (Harris BWC) at

3:23-3:36; Ex. 21 (Dashcam) at 2:26-3:10. Plaintiff escalated his resistance even further when the

officers attempted to place him in the back seat of the police car, thrashing his limbs and torso so violently that he fell to the ground, taking some of the officers with him. App. Ex. 2 (Whitman BWC) at 3:10-5:18; Ex. 1 (Harris BWC) at 3:48-5:57; Ex. 5 (Luciano BWC) at 0:33-2:42. The officers then held him on the ground while they restrained his ankles with a ziptie and conducted a custodial search of his clothing. *Id.* When they officers tried to put Plaintiff into the backseat, he shrieked and held his body rigid (so he would not fit through the door) while the officers tried to push and pull him into the backseat. *Id.* When the officers finally managed to force him into the backseat and closed the door, Plaintiff continued to berate the officers as he sat in the squad car. *Id*.

Shortly thereafter, Plaintiff had a conversation with one of the officers in which he admitted to having outstanding traffic warrants and committing the traffic violation for which Harris and Guab had pulled him over:

| | |
|---|---|
| Hayes: | "Y'all do this for no reason, man! I gotta go get something to eat for my kids, and that's how they do me?! Fuck, yo!" |
| Luciano: | "No. So I came in late, okay? I came in late for everything." |
| Hayes: | "And they handled me so rough, sir! **I complied, I said 'what did I... I didn't give nobody no attitude or anything**, sir. I got four kids that is waiting on me right now. They are hungry. They are hungry, and I gotta go feed them, man!" |
| Luciano: | "Okay." |
| Hayes: | "And that's it! **They say I failed to, failed to signal at the stop sign.**" |
| Luciano: | "The stop sign?" |
| Hayes: | "**I mean, I was wrong for that, yes.**" |
| Luciano: | "So that was the reason for contact for the stop. Okay." |
| Hayes: | "**Yes. I understand that.** And I was gonna tell them, what was I being detained for? I don't have any warrants. My name is... I mean, I mean **I have warrants maybe for speeding**, or something like that, . . ." |

11

App. Ex. 5 (Luciano BWC) 3:45-4:35. Indeed, although he makes conclusory and unsupported allegations about "racial profiling," Plaintiff now admits in his First Amended Complaint that he committed the traffic violation when he "failed to indicate before turning left in an intersection." Compl. ⁋⁋ 23, 105.

Once Plaintiff was under control, Harris was able to use the information on his driver's license to finish investigating the domestic violence warrant and discovered that Plaintiff Silvester Hayes was not the "Sylvester Hayes" named in that felony warrant. App. at 7.

In his Complaint, Plaintiff claims that he complied with the officers' directions and the officers punched, kicked, and tased him and then arrested him for no reason. The videos show that Plaintiff admittedly committed the traffic violation for which he was stopped, and that he violently resisted arrest for several minutes. App. Ex. 1 (Harris BWC) at 1:27-6:07; Ex. 2 (Whitman BWC) at 0:40-1:13; Ex. 4 (Guab BWC) 0:00-3:38; Ex. 5 (Luciano BWC) at 0:33-2:42; Ex. 21 (Dashcam) 0:00-4:10. The videos show that none of the officers ever punched, kicked, or tased Plaintiff. *Id.* Instead, the videos show that rather than escalating force, Guab and Harris worked together with several other officers to take Plaintiff to the ground without injuring him, and to get him under control, handcuffed, searched, and into the back of the police car using only restraint holds, pressure points, and body weight. *Id.* Once Plaintiff was subdued and no longer resisting, the officers ceased all uses of force. App. at Ex. 22 (backseat video). The officers then summoned an ambulance to the scene as a precaution; a paramedic examined Plaintiff and observed no injuries, and Plaintiff did not complain of any injuries. App. at 17. Guab and Harris then transported Plaintiff to jail. App. Ex. 12-18 (Guab and Harris BWCs); Ex. 22 (backseat video). There are no disputed facts in this case, and Defendants are entitled to summary judgment.

### III.    Legal Standards Applicable to Motions for Summary Judgment

#### A.    Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The moving party, however, need not support his motion with affidavits or other evidence negating the elements of the nonmovant's claim. *Id.* Once the moving party has satisfied this initial burden, the burden then shifts to the nonmoving party to show that summary judgment is not proper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992).

To withstand a motion for summary judgment, the nonmovant must present evidence sufficient to establish the existence of a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-23; *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). In other words, the nonmovant must set forth specific facts supported by competent summary judgment evidence that would establish each of the challenged elements of its case for which it will bear the burden of proof at trial. *Topalian*, 954 F.2d at 1131. The nonmovant cannot rest upon mere conclusory allegations or denials of the adverse party's pleadings but must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]."

13

*Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" should not be considered by the Court. *Id.*

While the Court must construe all evidence and justifiable inferences drawn from the record in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986), it need not consider conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation when ruling on a summary judgment motion. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth*, 19 F.3d at 1533. Moreover, the Court should not assume in the absence of sufficient proof that the nonmovant could or would prove the necessary facts. *Lynch Props. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

**B.      The qualified immunity defense alters the burden of proof on summary judgment.**

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, provided their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Police officers are specifically entitled to assert this qualified immunity defense. *Gassner v. City of Garland*, 864 F.2d 394 (5th Cir. 1989). Here, the Officers invoke their entitlement to qualified immunity in their motion to dismiss, or in the alternative, their motion for summary judgment, which in this case, is "at the earliest possible stage in litigation."

14

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id*. Plaintiffs bear the burden of proof both on summary judgment and at trial. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

In determining qualified immunity, courts engage in a two-part analysis that can be performed in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016); . One part of the analysis entails "assess[ing] whether a statutory or constitutional right [were] violated on the facts alleged." *Id*. The plaintiff must show "that the official violated [his or her] statutory or constitutional right." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011).

Second, the plaintiff must show that the right was "clearly established" at the time of the challenged conduct. *Harlow*, 457 U.S. at 818. A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right at issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense, but in a more particularized sense so that it is apparent to the official that his actions (what he is doing) are unlawful in light of pre-existing law. *Creighton*, 483 U.S. at 640; *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997) (holding that to overcome qualified immunity, pre-existing law must truly compel the conclusion that what the defendant is doing violates federal law in the circumstances).

The analysis does not end there. Even if the government official's conduct violates a clearly established right, the official is entitled to immunity if his conduct was objectively reasonable. *See Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008). Taken together, the second step in the analysis requires the Court to determine "whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008). In *Anderson v. Creighton*, the Supreme Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him. 483 U.S. at 641. If public officials or officers of "reasonable competence could disagree [on whether an action is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (citing *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

## IV.   Arguments and Authorities

### A.   The officers are entitled to qualified immunity on all claims against them.

Guab and Harris are entitled to qualified immunity on all claims against them because the indisputable video evidence shows that they did not violate Plaintiff's constitutional rights. To defeat the officers' assertion of qualified immunity, Plaintiff must show (a) that the officers violated a constitutional right, and (b) that the right was "clearly established" at the time of the challenged conduct such that no reasonable officer or public official *could have believed* that his conduct was lawful. *Anderson*, 483 U.S. at 641. Because Plaintiff cannot establish a violation of his constitutional rights or point to any evidence that raises a genuine issue of material fact concerning that issue, his claim fails as a matter of law and the officers are entitled to summary

16

judgment. Moreover, even if Plaintiff satisfies the first prong of the qualified immunity analysis, he cannot establish the second prong necessary to overcome qualified immunity. Therefore, summary judgment is appropriate.

>    **1.    Videos from the officers' body-worn cameras show that Harris and Guab did not violate Plaintiff's constitutional rights.**

In his First Amended Complaint, Plaintiff claims that he was compliant when the officers allegedly punched, kicked, and tased him and then arrested him for no reason. The videos, however, show that Plaintiff admittedly committed the traffic violation for which he was stopped, and that he violently resisted arrest for several minutes. App. Ex. 1 (Harris BWC) at 1:27-6:07; Ex. 2 (Whitman BWC) at 0:40-1:13; Ex. 4 (Guab BWC) 0:00-3:38; Ex. 5 (Luciano BWC) at 0:33-2:42; Ex. 21 (Dashcam) 0:00-4:10. There are no material disputed facts about the officers' actions during their encounter with Plaintiff in this case because the entire incident was captured on the officers' body-worn and in-car cameras. Although the Court must view the record in the light most favorable to the non-movant, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court "need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Scott*, 550 U.S. at 381). Video footage of the incident shows that the officers did not unlawfully arrest Plaintiff without probable cause or use excessive force against him in violation of Plaintiff's constitutional rights. Instead, the video evidence blatantly contradicts Plaintiff's allegations in his complaint and, therefore, the Court should disregard them in ruling on Defendants' summary judgment motion.

a.   **Videos from the officers' body-worn cameras show that Harris and Guab did not use excessive force against Plaintiff.**

An officer's use of force is excessive when "an arrestee 'suffers an injury that results directly and only from [the officer's] clearly excessive and objectively unreasonable use of force.'" *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020)). The facts must be viewed from "the perspective of a reasonable officer on the scene, rather than . . . the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). When evaluating the use of force,

> Various factors guide the analysis, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Additionally, we consider the relationship between the need for force and the amount of force used. Facing an uncooperative arrestee, officers properly use measured and ascending actions that correspond to the arrestee's escalating verbal and physical resistance.

*Betts*, 22 F.4th at 582 (internal quotations and citations omitted).

Each of the *Graham* factors weighs strongly in favor of the officers and demonstrates the officers' use of force was not clearly excessive to the need or objectively unreasonable. First, the crime of resisting arrest is severe under these circumstances. Guab's order to exit the vehicle during a traffic stop was *per se* lawful. *See, e.g.*, *Pennsylvania v. Mimms*, 434 U.S. 106, 109-10 (1977) (per curiam) (officer can order driver out of the car "as a matter of course" during traffic stops); *see also Maryland v. Wilson*, 519 U.S. 408, 414 (1997) ("In this case we consider whether the rule of [*Mimms*] that a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle, extends to passengers as well. We hold that it does."). Plaintiff did not obey that lawful order. Instead, he resisted arrest by refusing to get out of the car and then physically fighting the officers as they tried to pull him out of the car, and he *admittedly did so with a semi-automatic pistol in his hip pocket.* Compl. ⁋ 35; App. at 7; Ex. 2 (Whitman BWC) at 0:53-1:14.

18

Although resisting arrest is a Class A misdemeanor under Texas law, Tex. Penal Code § 38.03, the Court should consider the manner and circumstances in which Plaintiff committed the crime when judging its severity. Here, Plaintiff's actions created the exact scenario that prompted *Mimms'* bright-line rule: the Supreme Court "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." *Mimms*, 434 U.S. at 110 (internal quotations omitted). Harris and Guab had seen Plaintiff commit a traffic violation (App. at 7; Ex. 21 (Dashcam) at 0:00-0:04), and a database check led them to believe that Plaintiff may have been the subject of an active arrest warrant for felony domestic violence, a serious crime known for recidivism. App. at 7. There is a strong public interest in the swift apprehension of fugitives suspected of family violence to prevent them from inflicting further harm on their victims. "Reoffending is common; some studies have reported that approximately one-half of survivors of domestic violence report reoccurrence of domestic violence within 12 months, and one -half of individuals who have perpetrated domestic violence commit a new episode of general violence within 3 months." Rongqin Yu, et al., *Development and Validation of a Prediction Tool for Reoffending Risk in Domestic Violence*, 6 Journ. Am. Med. Ass'n 7 (July 2023).[5] Plaintiff interfered with the officers' lawful responsibility to execute a traffic stop and investigate whether he was indeed the "Sylvester Hayes" wanted for felony domestic violence.

The second *Graham* factor also weighs in favor of the officers because Plaintiff posed an immediate threat to their safety. As previously noted, Plaintiff had a gun in his right hip pocket,

---

[5] Available online at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10372708/#:~:text=Reoffending%20is%20common%3B%20some%20studies,general%20violence%20within%203%20months.

where it was easily accessible to him but not visible to Guab. Compl. ⁋ 35; App. at 7, Ex. 2 (Whitman BWC) at 0:53-1:14. As the Supreme Court noted, one of the most dangerous aspects of traffic stops (and indeed policing in general) is the occupant's ability to ambush officers with firearms concealed within the passenger compartment. *Mimms*, 434 U.S. at 110. Plaintiff's conduct also created the other major danger acknowledged in *Mimms*: the "hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle." *Id*. at 111. The road where the incident occurred did not have a shoulder; Plaintiff's and the officers' vehicles were parked in the rightmost lane of traffic. App. Ex. 21 (Dashcam) at 0:18-4:10. Plaintiff's poor choices forced four officers to engage with him in a lengthy wrestling match outside the driver's side door that several times spilled into the middle lane of traffic. *Id*. at 1:56-4:10. Cars continuously drove by in the next lane of traffic within a few feet of the officers trying to subdue Plaintiff. *Id.* at 0:18-4:10. The danger of such proximity was heightened by the fact that the drivers were visibly gawking at the scene instead of focusing on safely operating their vehicles. *Id.* Additionally, Plaintiff's thrashing repeatedly knocked the officers off balance, and his continuous shrieking impeded the officers' ability to hear approaching vehicles; these actions reduced the officers' ability to protect themselves and increased the likelihood that an officer would fall or be pushed into the path of oncoming traffic. *Id.* at 2:15-4:10. Finally, Plaintiff could have harmed the officers by punching, kicking, biting, or otherwise injuring them as he fought against their efforts to arrest him.

The third *Graham* factor, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, also weighs in favor of the officers. The video evidence indisputably shows that Plaintiff actively resisted arrest by fighting against the officers' efforts to remove him from the car, handcuff and search him, and place him in the back of the police car. In his Complaint,

Plaintiff claims that he complied with the officers' orders and the officers punched, kicked, and tased him and then arrested him for no reason. Compl. ⁋ 39. The videos show that Plaintiff admittedly committed the traffic violation for which he was stopped, and that he violently resisted arrest for several minutes. App. Ex. 1 (Harris BWC) at 1:27-6:07; Ex. 2 (Whitman BWC) at 0:40-1:13; Ex. 4 (Guab BWC) 0:00-3:38; Ex. 5 (Luciano BWC) at 0:33-2:42; Ex. 21 (Dashcam) 0:00-4:10. Specifically, the videos show Plaintiff pulling his arms and legs away from the officers' grasps, rolling, thrashing and straining to get away from their restraint. *Id.* Plaintiff repeatedly shouted profanities at the officers and screamed "help me!" and "they're hurting me!" over and over. *Id.*

In addition to the *Graham* factors, the Fifth Circuit also considers "the relationship between the need for force and the amount of force used. Facing an uncooperative arrestee, officers properly use measured and ascending actions that correspond to the arrestee's escalating verbal and physical resistance." *Betts*, 22 F.4th at 582. Guab first tried to gain Plaintiff's compliance by using a polite but firm tone to calmly direct him to step out of the car no less than twelve times. App. Ex. 1 (Harris BWC) at 0:45-1:27. Plaintiff did not comply, and instead chose to argue and remain seated in the car. *Id.* When Guab opened the car door to facilitate Plaintiff's exit, Plaintiff became more belligerent, complaining that he had not given Guab permission to open the door. *Id*. Next, Guab calmly warned Plaintiff that he would be tased if he did not get out of the vehicle. Plaintiff refused to comply. *Id*.

Guab waited for additional officers to arrive as backup before making any physical contact with Plaintiff. Only after additional police officers arrived did Guab grasp Plaintiff's arm to escort him from the car. *Id*. at 1:27. Another officer opened the front passenger door and looked inside the passenger compartment, where he saw the pistol in Plaintiff's pocket. App. at 7; Ex. 2

(Whitman BWC) at 0:53-1:14. That officer used one hand to grab Plaintiff's right wrist to prevent him from reaching for the gun, and he used the other to remove the gun from Plaintiff's pocket. *Id*.

Even after the gun was discovered, the officers did not escalate their use of force. The video evidence shows that Guab, Harris, and other Dallas police officers worked together to pull Plaintiff out of the car as Plaintiff actively resisted by thrashing and pulling away from the officers and falling to the ground. App. Ex. 21 (Dashcam) at 2:15-2:34. The officers used a combination of restraint holds, pressure and body weight to eventually wrestle Plaintiff onto his stomach and handcuff his wrists behind his back. App. Ex. 1 (Harris BWC) at 1:47-3:23; Ex. 2 (Whitman BWC) at 1:26-2:36; Ex. 4 (Guab BWC) at 0:00-1:45. Plaintiff continued to fight, thrash, and yell as the officers lifted him to his feet and maneuvered him to the nearest police car. App. Ex. 1 (Harris BWC) at 3:23-3:36; Ex. 21 (Dashcam) at 2:26-3:10. Plaintiff escalated his resistance even further when the officers attempted to place him in the back seat of the police car, thrashing his limbs and torso so violently that he fell to the ground, taking some of the officers with him. App. Ex. 2 (Whitman BWC) at 3:10-5:18; Ex. 1 (Harris BWC) at 3:48-5:57; Ex. 5 (Luciano BWC) at 0:33-2:42. The officers then held him on the ground while they restrained his ankles with a zip tie fastener and conducted a custodial search of his clothing. App. Ex. 1 (Harris BWC) at 3:48-5:57.

In his Complaint, Plaintiff alleges that when the officers learned he was armed, they launched into "a blur of excessive force" in which "the Officers began to kick, punch, and unnecessarily use their tasers on Plaintiff Hayes," and "hog tied" his feet. Compl. ¶¶ 39, 45. Video of the incident indisputably contradicts these allegations and shows that neither Guab, Harris, nor any of the other officers ever kicked or punched Plaintiff. App. Ex. 1 (Harris BWC) at 1:27-6:07; Ex. 2 (Whitman BWC) at 0:40-1:13; Ex. 4 (Guab BWC) 0:00-3:38; Ex. 5 (Luciano BWC) at 0:33-

2:42; Ex. 21 (Dashcam) 0:00-4:10. None of the officers ever drew their tasers, much less deployed them. *Id.* The videos clearly show that the officers restrained Plaintiff's feet with a zip tie, and the zip tie was never connected to Plaintiff's handcuffs in any kind of "hogtie" restraint. App. Ex. 1 (Harris BWC) at 3:48-5:57.

**b.   Video shows ample probable cause for Plaintiff's arrest.**

To state a § 1983 false arrest claim, Plaintiff must show that he was arrested without probable cause. *Burge v. St. Tammany Parish*, 187 F.3d 452, 480 (5th Cir. 1999). "A police officer has probable cause to arrest if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime." *Duckett*, 950 F.2d at 278. Undisputable video evidence shows that the officers had ample information to believe that Plaintiff had committed an array of crimes.

First, it is undisputed that Guab and Harris detained Plaintiff after observing him commit a traffic violation, specifically, failing to use a turn signal before turning, a violation of Section 545.104 of the Texas Transportation Code.[6] In his First Amended Complaint, Plaintiff clearly pleads that "**Plaintiff Hayes failed to indicate before turning left in an intersection**," and by making this fatal admission he has pled himself out of court.[7] Compl. ⁋ 23 (emphasis added). It is well-established that an officer "may arrest an individual without violating the Fourth Amendment if there is probable cause to believe that the offender has committed even a very minor criminal offense in the officer's presence." *Atwater v. City of Lago Vista*, 532 U.S. 318, 322 (2001).

---

[6] Although Plaintiff's First Amended Complaint makes conclusory and unsupported allegations that the traffic stop was prompted by "racial profiling" and was "obviously manufactured," Compl. ⁋⁋ 23, 25, 129, Plaintiff does not challenge the constitutionality of the stop.

[7] If Plaintiff's admission were not enough, the officers' dashboard camera recorded the latter half of Plaintiff's turn; the video shows that his turn signal was not activated. App. Ex. 21 (Dashcam) at 0:00-0:02. Plaintiff also admitted to committing that traffic violation and to having outstanding warrants for speeding during a subsequent conversation with Officer Luciano (App. Ex. 5 at 4:15-4:38).

Plaintiff's admitted traffic violation in the officers' presence provided probable cause for his arrest before the officers even activated their emergency lights. Plaintiff's oft-repeated complaints about "mistaken identity" is a red herring. For purposes of the probable cause analysis, whether he was the subject of the domestic violence warrant is irrelevant because his admitted traffic violation gave them probable cause to arrest him before their interaction with Plaintiff even began.

In addition to the admitted traffic violation, the officers both observed Plaintiff's verbal and then physical refusal to comply with Guab's instruction to exit his vehicle. [8] App. Ex. 1 (Harris BWC) at 0:00-5:57; Ex. 4 (Guab BWC) at 0:00-3:38; Ex. 21 (Dash Cam) at 0:00-4:10. This conduct constitutes the crime of resisting arrest, search or transportation:

> A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another by using force against the peace officer or another.

Tex. Penal Code § 38.03(a). Plaintiff's physical resistance also constituted interference with public duties: "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with…a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." Tex. Penal Code § 38.01(a)(1).

Guab politely instructed Plaintiff to step out of the car twelve times. App. Ex. 1 (Harris BWC) at 0:46-1:27. Plaintiff chose instead to remain in his car and argue with Guab. *Id.* He then yelled and fought the officers as they removed him from his car, yelled and fought as they forcibly walked him to a squad car, yelled and fought while they performed a custodial search, and yelled

---

[8] It has been settled law since 1977 that an officer may lawfully order a driver out of his vehicle as a "precautionary measure to afford a degree of protection to the officer" "even if there is nothing unusual or suspicious about [the driver's] behavior." *Mimms*, 434 U.S. at 109-10. The Supreme Court has reiterated this bright-line rule on numerous occasions since *Mimms*. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 155 n. 4 (1978); *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983); *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (holding that passengers as well as drivers can be ordered out of the car as a matter of course).

and fought as they tried to place him in the back seat. App. Ex. 1 (Harris BWC) at 1:27-6:07; Ex. 2 (Whitman BWC) at 0:40-1:13; Ex. 4 (Guab BWC) 0:00-3:38; Ex. 5 (Luciano BWC) at 0:33-2:42; Ex. 21 (Dashcam) 0:00-4:10. The videos show that Plaintiff *never* complied. *Id.* This conduct plainly violated Tex. Penal Code §§ 38.03(a) and 38.01(a)(1) and provided ample probable cause for Plaintiff's arrest. Accordingly, Plaintiff's unlawful arrest claim fails as a matter of law and Defendants are entitled to summary judgment.

## 2.    Plaintiff cannot show that Harris and Guab violated a constitutional right that was clearly established at the time of the incident.

As demonstrated above, based on the undisputed video evidence, Plaintiff cannot show that Harris and Guab unlawfully arrested or used excessive force against him in violation of his Fourth Amendment rights. Therefore, Plaintiff cannot satisfy the first prong of the qualified immunity analysis (a constitutional violation). But Plaintiff also cannot satisfy the second prong of the qualified immunity analysis because he cannot show or raise a genuine issue of material fact that Guab and Harris violated a constitutional right that was "clearly established at the time" of the incident. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). A right is clearly established

> only if it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. To give officers that notice, the relevant law must not be defined at a high level of generality, but instead with specificity. Specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Consequently, officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.

*Betts*, 22 F.4th at 584 (cleaned up). "The Supreme Court strictly enforces the requirement to identify an analogous case and explain the analogy." *Bartlett*, 981 F.3d at 346. Here, Plaintiff claims Guab and Harris unlawfully arrested and used excessive force against him during the arrest; however, a reasonable police officer could have believed that Plaintiff's initial detention and arrest

were lawful under the circumstances, and that their subsequent use of force was justified in response to Plaintiff's active resistance to arrest. Plaintiff will not be able to point to a case holding that an officer who arrests a suspect for a traffic violation and who uses objectively reasonable force to subdue a resisting suspect violates the Fourth Amendment. In other words, Plaintiff cannot point to any Supreme Court or Fifth Circuit authority that bars officers from arresting a perpetrator for crimes they watched him commit, or from using reasonable force to effect the arrest of a suspect who is physically resisting.

Similarly, Plaintiff cannot point to a Fifth Circuit or Supreme Court case in which a court examined a factual situation similar to the events depicted in the officers' body- and dash-camera videos and concluded that the force the officers used was clearly excessive and objectively unreasonable. The Fifth Circuit has repeatedly analyzed traffic stops in which plaintiffs behaved similarly to Plaintiff and found the force used by the defendant officers, who responded with **far more** force than that used by Guab, Harris, and their colleagues, was lawful and reasonable.

One such traffic stop case is *Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir. 2021). The officers noticed that one of the brake lights on Tucker's vehicle was malfunctioning. When the officers activated their emergency lights to communicate to Tucker the need for him to pull over, Tucker kept driving for several minutes before stopping. Like Plaintiff, Tucker spewed a "loud, nonstop verbal tirade reflecting anger, frustration, and perceived racism, interspersed with cursing, and repeated, increasingly strident, complaints of being 'tired of this shit.'" *Id*. at 189. Tucker moved his hands manically but kept them visible. and complied with instructions to put his hands behind his back for handcuffing. *Id*. at 179. When officers grasped his arms, he flinched, and the officers felt tension in his arms; these reactions caused the officers to suspect Tucker was going to try to escape. *Id.* at 178. However, Tucker never pulled his hands away. *Id.* at 179. The

officers responded by forcefully taking Tucker to the ground to handcuff him. *Id*. Tucker pulled his arms from their grasp and failed to put them behind his back. Each of the officers punched Tucker at least once, and one officer kicked him. *Id*. at 181. The Fifth Circuit found that this use of force was reasonable under the circumstances and reversed the district court's denial of qualified immunity. *Id*. at 180.

In *Solis v. Serrett*, police pulled over a motorist they suspected of drunk driving. 31 F.4th 975, 982 (5th Cir. 2022). Solis, the driver's girlfriend, was a passenger in the car. The driver refused to perform a field sobriety test and was arrested without incident. Solis was obviously intoxicated and verbally hostile to the officers from the outset of the traffic stop; later she would ignore the officers' instruction to remain in a particular location and use her phone to record and narrate the officers' activities. *Id*. at 979. Solis was arrested for public intoxication, a Class C misdemeanor. *Id*. at 982. "The use of force demonstrated on the video evidence was relatively limited, involving only the officers' restraint of Solis's arms, a brief takedown, the force necessary to restrict her while she was handcuffed, and she was promptly brought to her feet." *Id*. at 983. The Court concluded that "[i]t was reasonable of Sims and Serrett to believe that, in light of Solis's interjections, her comments toward them, her resistance, and her indignation on being told she would be arrested, *some* degree of force would be necessary to subdue her" and reversed the district court's denial of qualified immunity.  *Id.* at 983, 987.

In *Cadena v. Ray*, officers were summoned to a hotel lobby to arrest the plaintiff's wife for public intoxication. 728 F. App'x 293 (5th Cir. 2018). The plaintiff (also intoxicated) objected and was "ordered to leave the lobby and wait outside. He did not comply with this order but instead spoke to his wife, yelled to his brother-in-law, who was also intoxicated and had approached the scene, and accused Officer Rodriguez of assault." *Id.* at 294. The officer told Cardena to put his

hands behind his back, but Cardena repeatedly refused and backed away. *Id*. The officers pushed him into a wall and then down to the ground in a prone position, but Cardena concealed his hands. The officers flipped him onto his stomach, and one officer kneeled on his back. *Id.* Another officer deployed his taser against Cardena twice, after which the officers were able to handcuff Cardena. *Id.* The Court held that the officers were justified in the "takedown" because they had reason to believe Cadena posed a threat to their safety and resisted arrest. In *Poole v. City of Shreveport*, the Court held that a suspect who "refus[ed] to turn around and be handcuffed . . . posed an 'immediate threat.'" *Id.* at 294. The Court also found that backing away from the arresting officer is active resistance and that all aspects of the takedown (wrestling and pinning her to the ground with a knee) were lawful. *Id.* at 294. Finally, the Court approved the use of the taser, noting that "[u]se of a taser is appropriate when a suspect continues to resist arrest. We have held that tasing is permissible "after [a suspect] continuously fail[s] to comply" and "resist[s] handcuffing," particularly when it is not "the first method to gain . . . compliance." *Id.* at 297.

> **B.      The City is entitled to summary judgment because the videos show that there were no underlying constitutional violations.**

Plaintiff seeks to hold the City liable under 42 U.S.C. § 1983 based on two theories: (A) having unconstitutional de facto policies that permit its police officers to effect unlawful arrests and use excessive force; and (B) inadequately training and supervising its officers so as to prevent them from effecting unlawful arrests and using excessive force. *See* Compl. at Count 3. Both claims require Plaintiff to plausibly plead and prove a violation of his constitutional rights. *See Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002); *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). There can be no basis for municipal liability in the absence of an underlying constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986); *see also Alpha v. Hooper*, 440 F. 3d 670, 672 (5th Cir. 2006) (same). If

the Court determines that the officers did not deprive Plaintiff of his constitutional rights, then Plaintiff's municipal liability claims against the City necessarily fail as a matter of law and must be dismissed. *Heller*, 475 U.S. at 798-799.

## V.   Conclusion

Guab, Harris, and their fellow officers treated Plaintiff professionally and compassionately. They used the minimum level of force possible to affect his arrest and used far less force than they were authorized to use under binding precedent in the Fifth Circuit. Because Plaintiff cannot satisfy either prong of the qualified immunity analysis, the Court should grant summary judgment in favor of Guab and Harris. Similarly, the indisputable absence of any violation of Plaintiff's constitutional rights means that the City is entitled to summary judgment against it as a matter of law.

Respectfully submitted,

CITY ATTORNEY OF THE CITY OF DALLAS

Tammy L. Palomino
City Attorney

*s/ Lindsay Wilson Gowin*
Lindsay Wilson Gowin
Deputy Chief of Torts
Texas State Bar No. 24111401
lindsay.gowin@dallas.gov

Dallas City Hall 7DN
1500 Marilla Street
Dallas, Texas 75201
Telephone:      214-670-3519
Telecopier:     214-670-0622

*Attorneys for Defendants Holly Harris, Walter Guab and the City of Dallas*

**CERTIFICATE OF SERVICE**

I certify that on April 1, 2024, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/ *Lindsay Wilson Gowin*
Senior Assistant City Attorney